IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| ERIC P. FIEDLER, M.D.,<br>Plaintiff<br><br>v.<br><br>SHADY GROVE REPRODUCTIVE<br>SCIENCE CENTER, P.C., t/a<br>SHADY GROVE FERTILITY<br>CENTERS AND SHADY GROVE<br>FERTILITY CENTER OF<br>PENNSYLVANIA, PLLC, d/b/a<br>SHADY GROVE FERTILITY,<br>Defendants | CIVIL ACTION<br><br><br>Case No. 1:13-cv-02737-CCC<br><br><br>THE HONORABLE CHRISTOPHER<br>C. CONNER |

## AMENDED COMPLAINT

### I.   The Parties

1.    Plaintiff, Eric P. Fiedler, M.D. ("Dr. Fiedler"), is a physician and fellowship trained, board-certified specialist in the field of Reproductive Endocrinology and Infertility, who at relevant times delineated below operated an infertility and reproductive medicine practice,[1] ambulatory surgical center,[2] and IVF/embryology laboratory,[3] at 2708 Commerce Drive, Harrisburg, Dauphin County, Pennsylvania, 17110.

---

[1] Advanced Center for Infertility and Reproductive Medicine, RPC (Dr. Fiedler's "clinical practice").
[2] Center for Reproductive Surgery, LLC (Dr. Fiedler's "ambulatory surgical center").
[3] Dr. Fiedler's "laboratory", which was one of two laboratories under Central Penn Reproductive Laboratory, LLC.

2.      Defendant, Shady Grove Reproductive Science Center, P.C., t/a Shady Grove Fertility Centers, is a Maryland professional corporation which operates a number of fertility and reproductive care clinics in Maryland, Virginia, and the District of Columbia.  Defendant, Shady Grove Reproductive Science Center, P.C., has been determined to be the sole member of Defendant Shady Grove Fertility Center of Pennsylvania, PLLC.  Defendant Shady Grove Fertility Center of Pennsylvania, PLLC, d/b/a Shady Grove Fertility, is a Pennsylvania professional limited liability company which operates four fertility and reproductive care clinics in Pennsylvania.  Defendant Shady Grove Reproductive Science Center, P.C. and Defendant Shady Grove Fertility Center of Pennsylvania, PLLC are hereinafter collectively referred to as "Shady Grove".

## II.   Factual Background

### A.   Cryopreservation, Labeling and Inventory of Embryos in Dr. Fiedler's Laboratory

3.      For cryopreservation of embryos in Dr. Fiedler's laboratory, straws (to contain embryos), a goblet (to contain straws) and a cane (to hold goblets), which were all unique for that patient, were labeled, as follows:

> Straw:  MR#, straw number, number of embryos in that straw, date frozen.
>
> Goblet:  name, MR#, date frozen (initial).
>
> Cane:  number.

The embryos were then transferred into the straws, typically 1 to 3 embryos per straw. The straws were frozen in liquid nitrogen and placed into the goblet, which clicked onto the cane. The cane was placed into a plastic sleeve that prevents the goblets from dislodging from the cane. The cane was placed in a canister (not unique to the patient), which was numbered by the manufacturer, and stored in a tank, which was also numbered.

4.      Along with labeling the straw, goblet and cane, an Embryo Inventory Card was recorded as follows: the patient's name and MR#; straw numbers, and for each straw number: number of embryos in that straw, date frozen (with type of IVF and developmental day); cane number; canister number; and tank number.

5.      All of the foregoing was performed, recorded and maintained in Dr. Fiedler's laboratory.

### B.      IVF Outcome Report used in Dr. Fiedler's Clinical Practice

6.      There is a form, entitled "IVF Outcome Report," that was used in Dr. Fiedler's clinical practice (not in the laboratory), to readily track the progression of embryo development and reference the number and quality of cryopreserved embryos, for purposes of planning uterine transfer.

7.      The IVF Outcome Report was housed in the patient's clinical chart, which was maintained in Dr. Fiedler's clinical practice office (not in the laboratory), and was not available to laboratory personnel while laboratory work was being performed and recorded in the laboratory. Rather, laboratory personnel

would document on the IVF Outcome Report outside of the laboratory.

8.     Given the purpose and use of the IVF Outcome Report, and given that it was documented outside of the laboratory, it was never intended or used as an inventory for cryopreserved embryos.

9.     Any error in documentation on the IVF Outcome Report, made outside of the laboratory, would not equate to a mislabeling of embryos or an error in the inventory of cryopreserved embryos.  Rather, since labeling and inventory occurred in the laboratory, any mislabeling or error in inventory would need to involve those records, i.e., the straw, goblet, cane and Embryo Inventory Card.

C.     **Patient X**

1. **Cryopreservation, Labeling and Inventory of Embryos**

10.     The procedure for cryopreservation of embryos, labeling and recording inventory in Dr. Fiedler's laboratory, set forth in section II. A. above, was followed for Patient X, yielding 4 straws with the following numbers of embryos per straw (n = number of embryos):  straw #1: n=2, straw #2: n=2, straw #3: n=4, straw #4: n=4).

11.     By the end of September of 2011, by reason of medical disability (orthopedic), Dr. Fiedler was compelled to close his ambulatory surgical center and laboratory, and therefore no longer performed IVF, cryopreservation of embryos, or uterine transfer of cryopreserved embryos.

12.     Desiring transfer of cryopreserved embryos to her uterus, on April 5,

4

2012, Patient X's frozen embryos were shipped from Dr. Fiedler's laboratory to Shady Grove's laboratory, where they were received on the same date.

13.    On April 5, 2012, Shady Grove's embryology laboratory logged in Patient X's embryos, identical to the recording of the Embryo Inventory Card at Dr. Fiedler's laboratory, as being contained in 4 straws, with the following numbers of embryos per straw (n=number of embryos):  straw #1: n=2, straw #2: n=2, straw #3: n=4, straw #4: n=4.[4]

14.    On September 4, 2012, Patient X's straw #1 was thawed for embryo transfer to her uterus.  Shady Grove's laboratory records (Embryo Thaw Sheet and Embryo Disposition) for said thaw and transfer reflect, as concerns numbers of embryos, that there had been 12 total embryos cryopreserved and that straw #1 (which was thawed for the transfer) contained 2 embryos, leaving 10 still cryopreserved.  Said records are the same as Dr. Fiedler's Embryo Inventory Card and Shady Grove's embryology laboratory log as regards the total number of embryos originally cryopreserved, and as regards straw #1.

15.    Moreover, Shady Grove's Pre-Thaw Embryo Inventory Preparation for the September 4, 2012 thaw and transfer is identical to Dr. Fiedler's Embryo Inventory Card and Shady Grove's embryology laboratory log, all reflecting 4 straws, with a total of 12 embryos, with the following numbers of embryos per

---

[4] Also on April 5, 2012, the embryologist who logged in the embryos sent an email to Patient X, simply relating that the embryos had arrived safely.

straw (n=number of embryos):  straw #1: n=2, straw #2: n=2, straw #3: n=4, straw #4: n=4.

16.    All of the foregoing records from Dr. Fiedler and Shady Grove, are consistent in recording the number of straws (4), total number of embryos (12), and/or number of embryos per straw (straw #1: n=2, straw #2: n=2, straw #3: n=4, straw #4: n=4).

17.    The September 4, 2012 embryo transfer was not successful, leading to another attempt at embryo transfer, the plan for which, as recorded by Shady Grove in a physician note of 9/19/12, was to "thaw 4 and [transfer] 2 best".  Again, in late October of 2012, Shady Grove records (Patient X's email of 10/22/12 and physician confirmation of 10/23/12) confirm that the Shady Grove doctor and Patient X had discussed thawing 4 embryos, and confirm the continuing plan to thaw 4 embryos.  The fact that Shady Grove's plan was to thaw 4 embryos is entirely consistent with the remaining straws containing the following numbers of embryos, as recorded by both Dr. Fiedler and Shady Grove as set forth above: straw #2: n=2, straw #3: n=4, straw #4: n=4.

18.    On October 23, 2012, Patient X's straw #s 2 and 3 were thawed for embryo transfer to her uterus.  Shady Grove's laboratory records for said thaw and transfer (Embryo Thaw Sheet and Embryo Disposition) reflect, as concerns numbers of embryos, that there were at that time a total of 10 remaining cryopreserved embryos (2 having been used on 9/4/12), and that straw #s 2 and 3

(which were thawed for the transfer) contained 2 and 4 embryos, respectively, leaving 4 still cryopreserved (in straw #4). Said records are the same as Dr. Fiedler's Embryo Inventory Card and Shady Grove's laboratory log as regards total number of embryos originally cryopreserved, and as regards straw #s 2, 3 and 4, and do not reflect any inconsistency in the numbers of embryos, or any reluctance to use the embryos from straw #s 2 and 3.

19.    Moreover, Shady Grove's "Pre-Thaw Embryo Inventory Preparation" record for the October 23, 2012 thaw and transfer is identical to Dr. Fiedler's Embryo Inventory Card and Shady Grove's embryology laboratory log, as regards straw #s 2, 3 and 4, with the following numbers of embryos per straw (n=number of embryos): straw #2: n=2, straw #3: n=4, straw #4: n=4.

20.    Finally, Shady Grove's computer spreadsheets reflect that 2 embryos were thawed on September 4, 2012 and were graded 100% (consistent with the grading of embryos in straw #1 as reflected in the Embryo Thaw Sheet), and 6 embryos were thawed on October 23, 2012, 4 of which survived and were graded 100%, 95-100%, 95%, and 90% (consistent with the grading of embryos which survived in straw #s 2 and/or 3 as reflected in the Embryo Thaw Sheet), leaving 4 embryos remaining cryopreserved in storage (in straw #4).

21.    Consistent with Dr. Fiedler's Embryo Inventory Card, all of the foregoing records from Shady Grove represent all of its contemporaneous embryology laboratory records, and are consistent with the number of straws (4),

total number of embryos (12), and number of embryos per straw (straw #1: n=2, straw #2: n=2, straw #3: n=4, straw #4: n=4).[5]

22.    Based on the foregoing labeling and inventory match, there was no potential that Patient X's embryos had been mislabeled, or that there was any error in inventory.[6]

## 2.   Error on the IVF Outcome Report

23.    In April of 2012, Shady Grove related to Dr. Fiedler that a portion of the documentation on the IVF Outcome Report did not match the Embryo Inventory Card; specifically, Shady Grove described that although the Embryo Inventory Card recorded the number of straws, total number of embryos, and distribution of embryos per straw as follows:  straw #1: n=2, straw #2: n=2, straw #3: n=4, straw #4: n=4, the IVF Outcome Report had been documented as follows: straw #1: n=2, straw #2: n=2, straw #3: n=2, straw #4: n=2, straw #5: n=4.[7]  The

---

[5] Records which reflect otherwise were addressed in the Verified Motion of Petitioner, Eric P. Fiedler, M.D. to Compel Discovery Previously Ordered, and for Computer Forensic Examination of Shady Grove Records pertaining to Patient X, at Section III.

[6] Shady Grove discarded Patient X's straw #s 1, 2 and 3 after thaw and use of the within embryos.  It is believed that Patient X's straw #s 1, 2 and 3 would not have been discarded after thaw and use of the within embryos if they had been "mislabeled" (i.e., labeled inconsistent with the number of embryos in the straws and the number of embryos recorded on the Embryo Inventory Card).

[7] On August 29, 2013, a conference call was held between representatives of Shady Grove and Dr. Fiedler, with counsel for both parties, during which Shady Grove described the same charting error that it had described in April of 2012.  Counsel for Dr. Fiedler confirmed Shady Grove's description of the charting error by letter to counsel for Shady Grove dated September 17, 2013, as follows:

> Please allow this correspondence to summarize the events which have been the subject of our recent communications ... .
>
> *  *  *
>
> On August 29, 2013, during a conference call with Shady Grove representatives Marc Portmann and Gil Mottla, the following specific explanation was offered ... .  There was an isolated event where the documentation on the IVF Outcome Report pertaining to a set of patients' embryos preserved at Dr. Fiedler's practice on 12/19/10 (8 embryos) and 12/20/10 (4 embryos) did not match the embryo inventory card.  Specifically, the embryo inventory card (which contained cross-outs) identified the 4 straws that existed,

foregoing description is entirely consistent with the contemporaneous embryology laboratory records from both Dr. Fiedler and Shady Grove.

24.     The error was limited to the documentation of numbers (straws and embryos per straw) for this one patient (Patient X), on the IVF Outcome Report, outside of the laboratory, in the clinical practice office chart; thus, it does not equate to a mislabeling or an error in inventory.  Nor does it involve Patient X's identifiers, much less any other patient; thus, it does not equate to a misidentification or mix-up of embryos.

25.     After speaking with his embryologist, Dr. Fiedler understood and explained why and how the error was made in the documentation on the IVF Outcome Report.[8]  Shady Grove expressed understanding, raised no concern, and

---

as follows (straw number = number of embryos in straw):  1=2, 2=2, 3=4, 4=4.  The IVF Outcome Report read as follows:  1=2, 2=2, 3=2, 4=2, 5=4.  Dr. Fiedler was contacted at the time by the Shady Grove embryologist who recorded Dr. Fiedler's explanation that "there were not enough straws to do 5" (which explanation, although partially recorded, makes sense).

* * *

To summarize what we understand from our discussion with you:  (1) the embryo inventory card was correct in the information that it contained (albeit, with some cross outs), (2) the information on the embryo inventory card matched the labeling on the goblet and straws that contained the embryos … .

Furthermore, Dr. Fiedler and his counsel confirmed Shady Grove's description of the error in the Verified Petition for Preliminary Injunction of Eric P. Fiedler, M.D. (see paragraphs 18-21), filed on October 10, 2012.  At no time has Shady Grove challenged the foregoing recitations of Shady Grove's description of the charting error.

[8] On 12/19/10, the IVF Outcome Report was filled out in the embryologist's office (outside of the embryology laboratory), before cryopreservation of 8 embryos that were ready, as follows:  straw #1 = 2, straw #2 = 2, straw #3 = 2, straw #4 = 2.  Later that day, in the laboratory, the embryologist realized that she only had 4 straws, and needed to reserve one straw for 4 embryos that were continuing to develop and would be ready for cryopreservation the next day, so she cryopreserved the 8 embryos that were ready, and labeled straws and recorded the Embryo Inventory Card, all accurately, as follows:  straw #1: n=2, straw #2: n=2, straw #3: n=4.  She reserved straw #4 for the 4 developing embryos.  The next day, 12/20/10, she cryopreserved the remaining 4 embryos, and the straw was labeled and Embryo Inventory Card recorded, both accurately, as follows:  straw #4: n=4.  She later located the chart in the practice offices, and completed the IVF Outcome Report by adding an additional straw with 4 embryos, as follows:  straw #5=4.

Thus, there was no error made in the laboratory:  cryopreservation, labeling of straws and recording the Embryo Inventory Card were all accurate, as follows:  straw #1: n=2, straw #2: n=2, straw #3: n=4, straw #4: n=4.  The only error was in charting the number of straws, and distribution of embryos per straw, on the IVF Outcome Report,

that was the last communication between Shady Grove and Dr. Fiedler on the topic
for over a year.

### 3. Shady Grove Transferred Patient X's Thawed Embryos to her Uterus, and Continues to Preserve her Unthawed Embryos

26.     Patient X was not told that her embryo straws had been mislabeled;
rather, she was told that there was only an issue with paperwork that was nothing
serious.  It was not implied to Patient X that there was any issue with transferring
her embryos to her uterus; in fact, the embryos from straw #s 1, 2, and 3 were
transferred to her uterus, and the embryos in straw #4 continue to be preserved for
future transfer.

### D. Shady Grove has been Misrepresenting:  1) that Dr. Fiedler Mislabeled and/or Mixed Up Embryos, and 2) that for that Reason No Embryos Cryopreserved in his Laboratory would be Used for Uterine Transfer

27.     In May of 2012, by reason of medical disability (orthopedic), Dr.
Fiedler was compelled to close his clinical practice and his remaining laboratory.
In connection therewith, in October of 2012 he transitioned his practice and his
patient charts to Shady Grove.  As of that time, Shady Grove had not raised any
concern with Dr. Fiedler regarding labeling, inventory, identity or transfer to the
uterus of embryos cryopreserved in his laboratory.

28.     In July of 2013, Dr. Fiedler first learned that Shady Grove had ~~been~~

---

which again is only used in the clinical practice office for planning purposes; it is not used or intended for embryo
inventory.

~~misrepresenting, to multiple patients, that he mislabeled several other of his~~ ~~patient's embryos, and that for that reason no embryos cryopreserved in his~~ ~~laboratory would be used for uterine transfer.  Dr. Fiedler has since learned that~~ ~~Shady Grove has made such representations to at least one healthcare provider~~ ~~and/or facility in the community, leading said provider and/or facility to refuse to~~ ~~use embryos cryopreserved in his laboratory or uterine transfer~~ **communicated defamatory statements—namely, that Dr. Fiedler had mislabeled and/or mixed up several of his patients' embryos, and that for that reason no embryos cryopreserved in his laboratory would be used for uterine transfer— to multiple patients in the spring and summer of 2013.[9]**

~~29.    Shady Grove's representations are false for the following reasons:~~

~~a.    Patient X is the only patient for whom there was any issue with documentation, and~~

~~b.    Patient's X's embryos were not mislabeled.~~

**29.    The defamatory statements were communicated by Shady Grove doctors Jason G. Bromer, M.D. and/or Melissa A. Esposito, M.D. to the following patients (couples or individuals, identified by last initial): Patient(s) Z; Patient(s) N; Patient(s) W; and Patient(s) B.[10]**

---

[9] Shady Grove has control of the records which indicate the precise dates that the defamatory communications were made to patients.

[10] The Health Insurance Portability and Accountability Act of 1996 (HIPAA) prohibits Plaintiff from publically identifying the patients to whom defamatory statements were communicated.  However, Plaintiff is able to produce the full names of the patients if this Court requests in-camera review, and Plaintiff will produce the full names to Shady Grove in discovery.

30.   ~~Moreover, the clear implication of Shady Grove's misrepresentation, that there has been embryo misidentification and/or mix-up, is patently wrongful.~~

**30.   At all relevant times, Drs. Bromer and Esposito were actual or ostensible employees and agents of Shady Grove acting within the course and within the scope of their employment with their principal Shady Grove.**

31.   ~~Shady Grove's unilateral decision not to transfer to the uterus any embryos that were cryopreserved in Dr. Fiedler's laboratory is unwarranted because:~~

> a.   ~~The facts upon which the decision is allegedly based are not true, since embryos were not mislabeled, much less for multiple patients; and,~~

> b.   ~~The decision is not based on Patient X, as evidenced by the fact that Shady Grove transferred Patient X's thawed embryos to her uterus, and continues to preserve the remaining embryos for transfer to her uterus.~~

**31.   More specifically, on March 6, 2013, Patient(s) Z was/were told by Shady Grove Drs. Esposito and Bromer from Shady Grove offices that "several other patients" embryos from Dr. Fiedler's lab were "mislabeled" and for that reason Shady Grove would not perform uterine transfer of any embryos from Dr. Fiedler's lab.**

32.   ~~Instead, Shady Grove has financial incentive not to use embryos~~

~~cryopreserved in an outside laboratory, but rather to pursue fresh IVF, as follows:~~

  ~~a.  There is increased profit on fresh IVF as opposed to uterine transfer of cryopreserved embryos; and,~~

  ~~b.  The ability to market higher IVF success rates (arising out of the fact that couples with proven success (they became pregnant and therefore still have preserved embryos) are being routed back for fresh IVF).~~

**32. Patient(s) N was/were told by Shady Grove from Shady Grove offices in the spring and/or summer of 2013 that Shady Grove would not perform uterine transfer of their embryos from Dr. Fiedler's lab, due to "some mislabeling."**

~~33. Shady Grove's misrepresentations and unilateral decision not to transfer to the uterus any embryos that were cryopreserved in Dr. Fiedler's laboratory are recklessly prejudicial, in that embryos have been, and are in immediate jeopardy of being, unnecessarily and irreparably discarded, in favor of the pursuit of fresh IVF, at emotional and financial cost to patients. Moreover, Shady Grove's conduct is defamatory to Dr. Fielder. The foregoing tortious conduct is of a continuing nature in that, unless corrected by injunctive relief as set forth below in the Relief Requested, there will be continuing refusal, by reason of the misrepresentations, to use embryos cryopreserved in Dr. Fiedler's laboratory for uterine transfer, resulting in: 1) embryos being discarded, and 2) continuing~~

~~defamation of Dr. Fiedler.~~

33.     Patient(s) W was/were seen at Shady Grove for multiple visits in February of 2013, including by Dr. Bromer, preparing for uterine transfer of embryos from Dr. Fiedler's lab, before being told by Drs. Bromer and Esposito from Shady Grove offices on March 7, 2013 that Shady Grove received embryos that were supposed to belong to one patient of Dr. Fiedler's, but instead were found to belong to a different patient (i.e., were mixed-up), and for that reason Patient W's embryos would not be used for uterine transfer.  This timeline for Patient(s) W reflects that it was not until February or March of 2013 that Shady Gove reversed course and refused to use embryos from Dr. Fiedler's lab.

34.     Patient(s) B was/were seen at Shady Grove by Dr. Bromer over the winter of 2012 for several visits, preparing for uterine transfer of embryos from Dr. Fiedler's lab, before being told by Dr. Bromer in March of 2013 from Shady Grove offices that Shady Grove received documentation indicating that embryos from Dr. Fiedler's lab did not belong to the patients they were supposed to be from (i.e., were mixed-up) and for that reason Shady Grove would not perform uterine transfer of any embryos from Dr. Fiedler's lab.  This timeline for Patient(s) B reflects that it was not until the spring of 2013 that Shady Gove reversed course and refused to use embryos from Dr. Fiedler's lab.

35.     Counsel for Patient(s) Z has informed counsel for Dr. Fiedler that Patient(s) Z is/are bringing a medical malpractice suit against him, stemming from the defamatory statements Drs. Bromer and Esposito communicated to Patient(s) Z and Patient(s) Z's subsequent discarding of embryos.  For this reason, Dr. Fiedler has personally incurred legal expenses.

36.     Shady Grove's representations are false for the following reasons:

    a.     Patient X is the only patient for whom there was any issue with documentation, and

    b.     Patient X's embryos were not mislabeled and did not belong to a different patient.

37.     The clear meaning of Shady Grove's misrepresentations, that there has been embryo misidentification and/or mix-up, is patently wrongful.

38.     Shady Grove's statements that it would not transfer to the uterus any embryos that were cryopreserved in Dr. Fiedler's laboratory by reason of mislabeling or mix-up are misrepresentations because:

    a.     The facts upon which the statements are allegedly based are not true, since embryos were not mislabeled or mixed-up for Patient X, much less for multiple patients;

    b.     Shady Grove transferred Patient X's thawed embryos from Dr. Fiedler's lab to her uterus, and continues to preserve the remaining embryos for transfer to her uterus, and;

     **c.**    **It was not until the spring of 2013 that Shady Grove**

           **reversed course and refused to use embryos from Dr.**

           **Fiedler's lab.**

39.    Instead, Shady Grove has financial incentive not to use embryos

cryopreserved in an outside laboratory, but rather to pursue fresh IVF, as follows:

      a.    There is increased profit on fresh IVF as opposed to uterine

          transfer of cryopreserved embryos; and,

      b.    The ability to market higher IVF success rates (arising out of

          the fact that couples with proven success (they became pregnant

          and therefore still have preserved embryos) are being routed

          back for fresh IVF).

40.    Shady Grove's misrepresentations ~~and unilateral decision not to~~

~~transfer to the uterus any embryos that were cryopreserved in Dr. Fiedler's~~

~~laboratory~~ are recklessly prejudicial, in that embryos have been, and are in

immediate jeopardy of being, unnecessarily and irreparably discarded, in favor of

the pursuit of fresh IVF, at emotional and financial cost to patients.  Moreover,

Shady Grove's conduct is defamatory to Dr. Fiedler.  The foregoing tortious

conduct is of a continuing nature in that, unless corrected by injunctive relief as set

forth below in the Relief Requested, there will be continuing refusal, by reason of

the misrepresentations, to use embryos cryopreserved in Dr. Fiedler's laboratory

for uterine transfer, resulting in:  1) embryos being discarded, and 2) continuing

defamation of Dr. Fiedler.

III.   **Causes of Action**

[The Fraud/Intentional Misrepresentation count has been stricken.]

A.   **Count 1 (Defamation)**

42 **41**. Plaintiff repeats and realleges paragraphs 1-41 **40**.

43 **42**. The actions of Shady Grove, **by and through its agents, Drs.**

**Bromer and Dr. Esposito,** satisfy the elements of a cause of action for defamation,

as follows: (1) the defamatory character of the communication; (2) its publication

by the defendant; (3) its application to the plaintiff; (4) the understanding by the

recipient of its defamatory meaning; (5) the understanding by the recipient of it as

intended to be applied to the plaintiff; (6) special harm resulting to the plaintiff

from its publication; and (7) abuse of a conditionally privileged occasion.

44 **43**. The communication**s** by Shady Grove that several of Dr. Fiedler's

patients' embryos had been "mislabeled" **and mixed-up** is **are** defamatory in that

they damaged the reputation of Dr. Fiedler as to lower him in the estimation of the

community and will deter future patients from treating with him and other

community doctors from referring to him.

**44.   Shady Grove doctors Jason G. Bromer, M.D. and/or Melissa A.**

**Esposito, M.D. published defamatory statements from their Shady Grove**

**offices in the spring and summer of 2013 to the following patients: Patient(s)**

**Z; Patient(s) N; Patient(s) W; and Patient(s) B, as more specifically described**

**above.**

45.   ~~The communication was published in that it was made other than to the Plaintiff.~~

~~46~~ **45.** The communication clearly applies to Dr. Fiedler ~~as the statements about mislabeling were made about embryos that had been cryopreserved in Dr. Fiedler's laboratory~~ **and his laboratory**.

~~47~~ **46.** The understanding by the recipients of the communication's defamatory meaning is obvious given its nature, as evidenced by the fact that ~~one of Dr. Fiedler's patients~~ **Patient(s) Z has/have** already acted on Dr. Fiedler's damaged reputation by discarding embryos that had been cryopreserved in his laboratory.

~~48~~ **47.** The understanding by the recipients of the communication as intended to be applied to Dr. Fiedler is clear, i.e., that proper labeling of embryos cryopreserved in Dr. Fiedler's laboratory cannot be trusted.

~~49~~ **48.** Plaintiff alleges that the facts support a claim for defamation *per se*, for which no claim for special damages is required, because the communication at issue ascribes to Dr. Fiedler conduct that would adversely affect his fitness for the proper conduct of practicing medicine, to which he intends to return.  **Nonetheless, Dr. Fiedler has incurred special damages in the form of legal expenses, as alleged in paragraph 35.**

~~50~~ **49.** No conditionally privileged occasion applies to this case.

Nevertheless, to the extent that such a privilege is deemed to exist, Shady Grove

abused any such privilege by communicating ~~in an intentional or reckless manner~~

~~and by exceeding the necessary scope of such a communication~~ **odious falsehoods**

**in an intentional or reckless manner in order to reap financial gain from the**

**very patients with whom they purportedly have a common interest**.

   WHEREFORE, Plaintiff, Eric P. Fiedler, M.D., requests relief as set forth in

Section IV. below.

## IV.   <u>Relief Requested</u>

   ~~51~~ **50**. As set forth above, Plaintiff has suffered an irreparable injury, is

without adequate remedy at law, a remedy in equity is warranted considering the

balance of hardships between the Plaintiff and Defendants, and the public interest

would not be disserved by injunctive relief.

   WHEREFORE, Plaintiff respectfully asks that this Honorable Court:

   A.   Prohibit Shady Grove from representing: 1) that embryos were

mislabeled **or mixed-up** in Dr. Fiedler's laboratory, and/or 2) that by reason of

mislabeling **or mixing-up** of embryos in Dr. Fiedler's laboratory, Shady Grove will

not transfer to the uterus embryos from Dr. Fiedler's laboratory;

   B.   Compel Shady Grove to identify those patients and healthcare

providers and/or healthcare facilities to whom Shady Grove has represented: 1)

that embryos were mislabeled **or mixed-up** in Dr. Fiedler's laboratory, and/or 2)

that by reason of mislabeling **or mixing-up** of embryos in Dr. Fiedler's laboratory,

Shady Grove will not transfer to the uterus embryos from Dr. Fiedler's laboratory; and require that Shady Grove convey to said patients and healthcare providers and/or facilities, in writing, that, contrary to its misrepresentations, no embryos were mislabeled **or mixed-up** in Dr. Fiedler's laboratory and consequently there was no valid basis for Shady Grove's decision not to transfer to the uterus embryos that were cryopreserved in Dr. Fiedler's laboratory;

C.    Order custody of the charts of Dr. Fiedler's former patients, in the form in which they were transitioned by Dr. Fiedler to Shady Grove, be transitioned to a third party facility agreeable to Dr. Fiedler, in order to preserve the documentation as it existed at the time of transition by Dr. Fiedler to Shady Grove; and,

D.    Grant Dr. Fiedler such other and further relief as this Court deems equitable, just, and proper.

Respectfully submitted,

FOULKROD ELLIS
*Professional Corporation*

Date: __8/1/14__          By: _____

Andrew H. Foulkrod, Esquire
4000 Market Street
Camp Hill, PA 17011
Phone: (717) 909-7006
Fax: (717) 909-6955
andrew@foulkrod.com
Pa 77394

VERIFICATION

I, ERIC P. FIEDLER, M.D., hereby certify that I have read the foregoing *Amended Complaint,* which has been drafted by counsel on my behalf, and that the facts set forth therein are true and correct to the best of my knowledge, information and belief.

This statement and Verification are made subject to the penalties of 18 Pa.C.S.A. §4904, relating to unsworn fabrication to authorities; I verify that all the statements made in the foregoing are true and correct and that false statements may subject me to the penalties of 18 Pa.C.S.A. §4904.

Date: 7/16/14

Eric P. Fiedler, M.D.

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that I caused a true and correct copy of the foregoing

document(s) to be served via the Court's ECF system on the following counsel of

record.

Brian T. Feeney, Esquire
Greenbert Traurig, LLP
2700 Two Commerce Square
2001 Market Street
Philadelphia, PA 19103
*(Counsel for Respondent)*

FOULKROD ELLIS
PROFESSIONAL CORPORATION

DATE: 8/1/14          By:_____

Andrew H. Foulkrod, Esquire
4000 Market Street
Camp Hill, PA 17011
Phone: (717) 909-7006
Fax: (717) 909-6955
andrew@foulkrod.com
PA 77394