IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **ERIC P. FIEDLER, M.D.,** | : | **CIVIL ACTION NO. 1:13-CV-2737** |
| | : | |
| **Plaintiff** | : | **(Chief Judge Conner)** |
| | : | |
| v. | : | |
| | : | |
| **SHADY GROVE REPRODUCTIVE** | : | |
| **SCIENCE CENTER, P.C., t/a** | : | |
| **SHADY GROVE FERTILITY** | : | |
| **CENTERS**, *et al.*, | : | |
| | : | |
| **Defendants** | : | |

## MEMORANDUM

Presently before the court in the above-captioned matter is a motion (Doc. 33) filed by Shady Grove Reproductive Sciences Center, P.C., t/a Shady Grove Fertility Centers, and Shady Grove Fertility Center of Pennsylvania (collectively "Shady Grove"), seeking to dismiss the amended complaint (Doc. 29) of plaintiff Eric P. Fiedler, M.D.  For the reasons that follow, the court will grant the motion and dismiss plaintiff's amended complaint.

**I.   Procedural History**[1]

Eric P. Fiedler, M.D. ("Fiedler"), commenced this civil action with the filing of a document styled as a "verified petition for preliminary injunction" in the Court of Common Pleas for Cumberland County, Pennsylvania, on October 10, 2013.  (See

---

[1] The court and the parties are familiar with the unconventional procedural course charted in this matter.  As such, the court recites only the most pertinent procedural background herein.

Doc. 1 ¶ 1). Shady Grove timely filed a notice of removal (Doc. 1) to this court on November 7, 2013, pursuant to 28 U.S.C. § 1446. On November 11, 2013, Fiedler moved to remand the action to state court. (See Doc. 3). The court denied Fiedler's motion on January 14, 2014, concluding that Shady Grove's Maryland residence and Fiedler's Pennsylvania residence satisfy the diversity jurisdiction requirements of 28 U.S.C. § 1332(a)(1). (See Doc. 14). Pursuant to the parties' mutual agreement, (see Doc. 18), the court dismissed Fiedler's petition as moot and directed Fiedler to file a proper complaint and, to the extent applicable, a motion for injunctive relief, on or before February 24, 2014. (See Doc. 19).

On February 11, 2014, Fiedler filed a complaint (Doc. 20), asserting claims for fraudulent and intentional misrepresentation (Count I) and defamation (Count II) against Shady Grove. Shady Grove moved to dismiss both counts, (see Doc. 23), and Fiedler withdrew Count I in response to Shady Grove's motion. (See Doc. 25 at 1). On July 16, 2014, the court granted Shady Grove's Rule 12 motion and dismissed Fiedler's defamation claim without prejudice. (See Docs. 27-28). On August 1, 2014, pursuant to leave granted by the court's order, Fiedler filed an amended complaint (Doc. 29) in attempt to cure the deficiencies identified in the court's memorandum. Defendants' motion (Doc. 33) to dismiss Fiedler's amended complaint is presently before the court and ripe for review.

## II.   **Factual Background**

Fiedler is a fellowship-trained and board-certified physician specializing in the field of reproductive endocrinology and fertility. (Doc. 29 ¶ 1). At all relevant times, Fiedler operated both the Advanced Center for Infertility and Reproductive

2

Medicine, an infertility and reproductive medicine practice (the "clinical practice"); the Center for Reproductive Surgery, LLC, an ambulatory surgical center; and an *in vitro* fertilization ("IVF") and embryology laboratory, one of two laboratories under Central Penn Reproductive Laboratory, LLC.  (See id. ¶¶ 1 & nn. 1-3).  SG Science Center is a Maryland professional corporation which operates fertility and reproductive care clinics throughout Maryland, Virginia, and Washington, D.C.  (Id. ¶ 2).  SG Fertility Center is a Pennsylvania limited liability company operating four fertility and reproductive care clinics throughout Pennsylvania.  (Id.)  SG Science Center is the sole member of SG Fertility Center.[2]  (Id.)

The instant dispute arises from Shady Grove's alleged misrepresentations regarding Fiedler's embryonic cryopreservation practices, specifically his record-keeping practices.  Fiedler describes his record-keeping process as follows:

> For cryopreservation of embryos in Dr. Fiedler's laboratory, straws (to contain embryos), a goblet (to contain straws) and a can (to hold goblets), which were all unique for that patient, were labeled, as follows:
>
> Straw:  MR#, straw number, number of embryos in that straw, date frozen.
> Goblet: name, MR#, date frozen (initial).
> Cane: number.
>
> The embryos were then transferred into the straws, typically 1 to 3 embryos per straw.  The straws were frozen in liquid

---

[2] As the court has previously held, (see Doc. 14), the fact that plaintiff Fiedler and defendant SG Fertility Center are both Pennsylvania residents does not destroy the court's diversity jurisdiction.  The citizenship of a limited liability company is determined by the citizenship of its members.  See Zembelli Fireworks Mfg. Co. v. Wood, 592 F.3d 412, 420 (3d Cir. 2010).  Hence, both Shady Grove defendants are citizens of Maryland for purposes of establishing diversity, and the jurisdictional requirements of 28 U.S.C. § 1332(a)(1) are satisfied.

> nitrogen and placed into the goblet, which clicked onto the cane. The cane was placed into a plastic sleeve that prevents the goblets from dislodging from the cane. The cane was placed in a canister (not unique to the patient) which was numbered by the manufacturer, and stored in a tank, which was also numbered.
>
> Along with labeling the straw, goblet and cane, an Embryo Inventory Card ["EIC"] was recorded as follows: the patient's name and MR#; straw numbers, and for each straw number: number of embryos in that straw, date frozen (with type of IVF and developmental day); cane number; canister number; and tank number.

(Id. ¶¶ 3-4). Fiedler also utilized IVF Outcome Reports ("IORs"), which were maintained in his patients' charts in his clinical practice office and not in Fiedler's laboratory. (Id. ¶ 6). The IORs tracked the progression of embryonic development for purposes of planning uterine transfer. (Id.) According to Fiedler, any error in documentation on an IOR "would not equate to a mislabeling of embryos or an error in the inventory of cryopreserved embryos" because labeling and inventory occurred in the laboratory and not in his clinical practice office. (Id. ¶¶ 7, 9).

Fiedler followed the EIC documenting procedure outlined above for Patient X, one of his patients. (Id. ¶ 10). Patient X's EIC reflected four (4) straws with the following numbers of embryos per straw: straw #1, two (2) embryos; straw #2, two (2) embryos; straw #3, four (4) embryos; straw #4, four (4) embryos. (Id.) In September of 2011, by reason of personal medical disability, Fiedler closed both his ambulatory surgical center and his laboratory. (Id. ¶ 11). Following the closure of Fiedler's practice, Patient X desired to commence uterine transfer. (See id. ¶ 12). Patient X's frozen embryos were shipped from Fiedler's laboratory to Shady Grove on April 5, 2012. (See id.) Shady Grove's laboratory logged Patient X's embryos in

4

a manner and quality identical to Patient X's EIC. (See id. ¶ 13). Shady Grove attempted two unsuccessful transfers using the embryos in straws 1, 2, and 3 in September and December of 2012, respectively. (Id. ¶¶ 13-22). Its records reveal that the straws contained quantities consistent with Fiedler's EIC. (See id.)

In April of 2012, Shady Grove learned and informed Fiedler that the straw quantities identified on Patient X's EIC were inconsistent with those documented on her IOR. (Id. ¶ 23). According to the complaint, the IOR incorrectly identified the number of straws and embryos as follows: straw #1, two (2) embryos; straw #2, two (2) embryos; straw #3, two (2) embryos; straw #4, two (2) embryos; and straw #5, four (4) embryos. (Id.) Fiedler discussed the issue with his embryologist who explained the error, and Fiedler in turn explained the mistake to Shady Grove. (See id. ¶ 25). Shady Grove "expressed understanding . . . [and] raised no concern." (Id.) Thereafter, Shady Grove advised Patient X "that there was only an issue with paperwork that was nothing serious." (Id. ¶ 26). Shady Grove continues to store and preserve the embryos contained in straw #4 for future transfer. (Id.)

In May of 2012, Fiedler's disability caused him to close the remainder of his practice. (Id. ¶ 27). In connection with the closure, Fiedler transferred his practice and charts to Shady Grove. (Id.) Shady Grove raised no concerns at that time with regard to labeling, inventory, or transfer of the embryos cryopreserved in Fiedler's laboratory. (Id.) In July of 2013, Fiedler learned that Shady Grove misrepresented to several patients that Fiedler had mislabeled or mixed up multiple of his patients' embryos and, consequently, that no embryos cryopreserved in his laboratory would

be used for uterine transfers. (Id. ¶ 28).[3] Shady Grove doctors Jason G. Bromer, M.D. ("Bromer"), and Melissa A. Esposito, M.D. ("Esposito"), conveyed these misrepresentations to Patient Z, Patient N, Patient W, and Patient B. (Id. ¶ 29).

Specifically, on March 6, 2013, Esposito and Bromer informed Patient Z that embryos of "several other patients" from Fiedler's laboratory were "mislabeled" and unusable for uterine transfer. (Id. ¶ 31). Similarly, on March 7, 2013, Bromer and Esposito informed Patient W that it "received embryos that were supposed to belong to one patient of [Fiedler's] but instead were found to belong to a different patient (i.e., were mixed-up)," and for that reason, the embryos were unusable. (Id. ¶ 33). Also in March of 2013, Bromer advised Patient B that Shady Grove "received documentation indicating that embryos from [Fiedler's] lab did not belong to the patients they were supposed to be from," and for that reason, Shady Grove could not use Patient B's cryopreserved embryos. (Id. ¶ 34). In the spring and summer of 2013, Shady Grove also told Patient N that it "would not perform uterine transfer of their embryos from [Fiedler's] lab, due to 'some mislabeling.'" (Id.) According to Fiedler, Shady Grove is in exclusive possession of records that would establish the exact dates of the allegedly defamatory communications to Patient B and Patient N. (See id. ¶ 28 n.9). Fiedler asserts that at least one patient, Patient Z, has threatened to bring a professional malpractice action against him as a result of the allegedly defamatory statements. (Id. ¶ 35).

---

[3] Plaintiff's threshold allegations parallel those of his initial complaint. In subsequent paragraphs, plaintiff includes specific allegations aimed at curing the deficiencies identified by the court in its July 16, 2014 memorandum—namely, a lack of particularity with regard to the communications at issue.

### III.   Standard of Review

Rule 12(b)(6) of the Federal Rules of Civil Procedure provides for dismissal of complaints that fail to state a claim upon which relief may be granted. See FED. R. CIV. P. 12(b)(6). When ruling on a Rule 12(b)(6) motion to dismiss, the district court must "accept all factual allegations as true, construe the complaint in the light most favorable to the plaintiff, and determine whether, under any reasonable reading of the complaint, the plaintiff may be entitled to relief." Gelman v. State Farm Mutual Auto. Ins., 583 F.3d 187, 190 (3d Cir. 2009) (quoting Phillips v. Cnty. of Allegheny, 515 F.3d 224, 233 (3d Cir. 2008)); see also Kanter v. Barella, 489 F.3d 170, 177 (3d Cir. 2007) (quoting Evancho v. Fisher, 423 F.3d 347, 350 (3d Cir. 2005)). In addition to reviewing the facts contained in the complaint, the court may also consider "matters of public record, orders, exhibits attached to the complaint and items appearing in the record of the case." Oshiver v. Levin, Fishbein, Sedran & Berman, 38 F.3d 1380, 1384 n.2 (3d Cir. 1994); Pension Benefit Guar. Corp. v. White Consol. Indus., Inc., 998 F.2d 1192, 1196 (3d Cir. 1993).

Federal notice and pleading rules require the complaint to provide "the defendant fair notice of what the . . . claim is and the grounds upon which it rests." Phillips, 515 F.3d at 232 (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007)). To test the sufficiency of the complaint, the court must conduct a three-step inquiry. See Santiago v. Warminster Twp., 629 F.3d 121, 130-31 (3d Cir. 2010). In the first step, "the court must 'tak[e] note of the elements a plaintiff must plead to state a claim.'" Id. at 130 (quoting Ashcroft v. Iqbal, 556 U.S. 662, 675 (2009)). Next, the court should separate the factual and legal elements of a claim; well-pleaded

7

facts are accepted as true, while mere legal conclusions must be disregarded.  Id. at 131; see also Fowler v. UPMC Shadyside, 578 F.3d 203, 210-11 (3d Cir. 2009).  Once the court isolates the well-pleaded factual allegations, it must determine whether they are sufficient to show a "plausible claim for relief."  Iqbal, 556 U.S. at 579 (quoting Twombly, 550 U.S. at 556); Twombly, 550 U.S. at 555 (requiring plaintiffs to allege facts sufficient to "raise a right to relief above the speculative level").  A claim "has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  Iqbal, 556 U.S. at 678.  When the complaint fails to present a *prima facie* case of liability, courts should generally grant leave to amend before dismissing a complaint.  See Grayson v. Mayview State Hosp., 293 F.3d 103, 108 (3d Cir. 2002); Shane v. Fauver, 213 F.3d 113, 116-17 (3d Cir. 2000)).

## IV.  Discussion[4]

Fiedler contends that Shady Grove, through Drs. Bromer and Esposito, defamed his professional character and reputation by advising patients that Fiedler " 'mislabeled' and mixed-up" several patients' embryos.  (Doc. 29 ¶ 43).  To prevail

---

[4] As a threshold matter, the court finds that Fiedler's amended complaint cures the deficiencies identified in the court's prior Rule 12(b)(6) memorandum.  Therein, the court concluded that Fiedler's initial complaint failed to identify the "communications" at issue, the publisher of those communications, or the approximate date of their publication—all critical elements of a defamation claim.  (See Doc. 27 at 9-11).  This lack of specificity was fatal to the first iteration of plaintiff's claim.  (See id.)  In his amended pleading, Fiedler identifies Bromer and Esposito as the publishers of the statements, sets forth the statements' contents, and provides the dates thereof.  (See Doc. 29 ¶¶ 28-29, 31-34).  Defendants implicitly concede that Fiedler has cured these deficiencies by failing to raise a lack of specificity in their renewed Rule 12 motion.

on a claim for defamation, Fiedler must allege facts which, if proven, establish the following: (1) the defamatory character of the communication; (2) its publication by Shady Grove; (3) its application to Fiedler; (4) understanding by the recipient of its defamatory meaning; (5) understanding by the recipient of the communication as intended to be applied to Fiedler; (6) special harm resulting to Fiedler from the communication; and (7) abuse of any conditionally privileged occasion. See 42 PA. CONS. STAT. § 8343(a). Defendants' renewed Rule 12 motion tests the sufficiency of Fiedler's allegations against three of the statutory elements. First, it argues that Fiedler has suffered no harm resulting from the allegedly defamatory statements; second, that Fiedler's claim is barred by the common interest privilege; and third, that the statements are substantially true, precluding liability for defamation. The court addresses Shady Grove's arguments *seriatim*.

### A.     Requirement of Special Harm

Pennsylvania law requires defamation plaintiffs to prove "special harm" flowing from a defendant's defamatory communication. See 42 PA. CONS. STAT. § 8343(a)(6). However, when a particular statement "imputes to another conduct, characteristics, or a condition that would adversely affect" his fitness for the proper conduct of his profession, it constitutes defamation *per se* and a plaintiff is relieved of proving special damages resulting from the defendant's statement. Bakere v. Pinnacle Health Hosps., Inc., 469 F. Supp. 2d 272, 298 (M.D. Pa. 2006) (quoting Franklin Prescriptions, Inc. v. NY Times Co., 424 F.3d 336, 343 (3d Cir. 2005)); see also Pelagatti v. Cohen, 536 A.2d 1337, 1345 (Pa. Super. Ct. 1987). Fiedler asserts that Shady Grove's communications to its patients constitute defamation *per se*

because they detract from his professional reputation. Alternatively, he alleges "special harm" in the form of a threatened medical malpractice lawsuit. Shady Grove challenges both assertions.

Regarding defamation *per se*, Shady Grove maintains that Fiedler cannot establish professional reputational harm because he closed his practice in May of 2012. (See Doc. 34 at 7-9). Shady Grove directs the court to Chuy v. Philadelphia Eagles Football Club, 595 F.2d 1265 (3d Cir. 1979) as support for this proposition. In Chuy, the Third Circuit concluded that a retired professional football player's claim against his former employer for public comments regarding the medical reasons for his retirement could not constitute defamation *per se* when the plaintiff stated that he "definitely" would not return to the profession. Id. at 1282. The court noted that, because the relevant article was not published until "his career as a football player was over," the plaintiff could not recover on a defamation *per se* theory. Id.

The court agrees with Fiedler that, to the extent Chuy may have alluded to a "retirement exception" to the defamation *per se* rule, it is distinguishable from the instant matter. Unlike Chuy, Fiedler has not retired from the practice of medicine without any possibility of return. To the contrary, Fiedler expressly avers an intent to reopen a non-surgical practice and resume practicing medicine as soon as he is able. (Doc. 29 ¶ 48 (alleging that "he intends to return" to medicine as soon as permissible and practicable)). Bolstering this assertion is the fact that Fielder maintains his board certification, despite a temporary and involuntary closure of his practice. (See id. ¶ 1). Assuming these facts to be true, the court cannot conclude that Fiedler abandoned his profession in the same manner described in Chuy.

Shady Grove's statements question Fiedler's medical records-keeping practices and detract from his reputation as a reproductive endocrinology and fertility specialist. As such, Fiedler's complaint presents a plausible claim of slander *per se*.

### B.  Common Interest Privilege

Shady Grove next argues that a "common interest privilege" applies to its statements to four patients regarding the propriety of Fiedler's records-keeping practices. Pennsylvania law exempts from liability communications "made on a proper occasion, from a proper motive, and in a proper manner . . . whenever 'circumstances are such as to lead any one of several persons having a common interest in a particular subject matter correctly or reasonably to believe that facts exist which another sharing such common interest is entitled to know." Tucker v. Merck & Co., Inc., 102 F. App'x 247, 253-54 (3d Cir. 2004) (nonprecedential) (citing Maier v. Maretti, 671 A.2d 701, 706 (Pa. Super. Ct. 1995)). A defendant abuses the privilege, and thus waives its protection, when its publication: (1) is motivated by malice or negligence; (2) is made for a purpose beyond that for which the privilege is given; or (3) is made to an audience, or includes subject matter, beyond that reasonably necessary to accomplish its purpose. See id. at 254 (citing Elia v. Erie Ins. Exch., 634 A.2d 657, 661 (Pa. Super. Ct. 1993)).

Fiedler ostensibly concedes that the privilege applies, (see Doc. 35 10-14), but suggests that Shady Grove "abused the common interest privilege" and cannot benefit from its protections. (Id.) First, he alleges that Shady Grove could not have reasonably believed the statements that "several" of his patients' embryos "were mislabeled and mixed-up," (id. at 12-13), implying that Shady Grove's doctors acted

11

recklessly or negligently. Second, he charges that Shady Grove should have limited its disclosure to Patient X and described the mistake as a "chart" error rather than a "mislabeling" or "mix-up," (id. at 13), and by informing "multiple patients" of "several" mistakes, exceeded the necessary scope of the communication. And third, Fiedler avers that Shady Grove conveyed its "odious falsehoods" for a malicious purpose: "to extract financial gain from its own patients by forcing them to restate the IVF process over again." (Id. at 13-14). The court disagrees as to each point.

Fiedler disputes the scope of Shady Grove's statements, but nonetheless admits that they are grounded in truth. (Doc. 29 ¶¶ 23-25). Importantly, Fiedler concedes that Shady Grove *did* discover an error in documentation in an IVF Outcome Report: specifically, the number of straws and number of embryos per straw identified on Patient X's IVF Outcome Report did not match the number of straws and embryos per straw indicated on the Embryo Inventory Card. (Doc. 29 ¶ 23; also id. ¶ 24 ("The error was limited to documentation of numbers (straws and embryos per straw) for this one patient (Patient X), on the IVF Outcome Report, outside of the laboratory, in the clinical practice office chart."); ¶ 25 ("Dr. Fiedler understood and explained why and how the error was made in the documentation on the IVF Outcome Report.")). Drs. Bromer and Esposito simply relayed Shady Grove's discovery of the documentation errors to patients who had undergone IVF and cryopreservation in Fiedler's laboratory and sought uterine transfer of those cryopreserved embryos. Fiedler quarrels with the verbiage employed by Shady Grove—specifically, the phrases "mislabeled" or "mixed-up," and its statement that Shady Grove discovered "several" rather than a single instance of mislabeling—but

nonetheless does not dispute that Shady Grove's statements were actuated by his own—admitted—error. (<u>See</u> Doc. 35 at 12-13). The amended complaint simply does not support a finding that Shady Grove did not believe its statements were moored in truth.

In further support of his abuse-of-privilege argument, Fiedler broadly contends that Shady Grove did not intend to protect its patients' interests but instead to wished to "extract financial gain" from those patients by requiring them to undergo "fresh IVF." (Doc. 35 at 13-14 (citing Doc. 29 ¶ 39)). Fiedler offers no factual allegations to support this theory of Shady Grove's motive; rather, he speculates that the doctors' intent necessarily must have been premised on profit because "fresh IVF" results in "increased profit" and offers an "ability to market higher IVF success rates." (Doc. 29 ¶ 39). Rule 12(b)(6) requires plausibility, not speculation, <u>see</u> <u>Twombly</u>, 550 U.S. at 555 (requiring allegations of fact which "raise a right to relief above the speculative level"), and the court will not credit Fiedler's baseless conjecture regarding Shady Grove's motives.

The only motive which can be gleaned from Fiedler's *allegata* is that the Shady Grove doctors acted in the best interests of, and out of legitimate concern for, the health and well-being of their patients. To that end, the doctors advised all patients seeking transfer of embryos cryopreserved in Fiedler's laboratory of documentation errors in Fiedler's files. (<u>See</u> <u>id.</u> ¶ 31 (informing patient that embryos from "several other patients" were "mislabeled"); ¶ 32 (advising patient of "some mislabeling"); ¶ 33 (communicating to patient that another patient's embryos were "mixed-up"); ¶ 34 (same). Given Fiedler's admission of at least one error to

Shady Grove, the court cannot conclude that the doctors' statements were borne of either malice or negligence as contemplated by abuse-of-privilege jurisprudence. Similarly, the court has no concerns regarding the scope of the audience; Fiedler does not allege that the Shady Grove doctors shared the information with anyone other than those patients who were potentially affected by the admitted error. Accordingly, Fiedler has failed to demonstrate "abuse of a conditionally privileged occasion," 42 PA. CONS. STAT. § 8343(a)(7), and cannot succeed on a defamation claim against Shady Grove.[5]

---

[5] Given this conclusion, the court need not address Shady Grove's alternative position that its statements are substantially true.

**V.**     **Conclusion**

For all of the reasons stated herein, the court will grant Shady Grove's motion to dismiss. An appropriate order shall issue.

    /S/ CHRISTOPHER C. CONNER
Christopher C. Conner, Chief Judge
United States District Court
Middle District of Pennsylvania

Dated:     March 3, 2015